**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **JANICE WEBB o/b/o Z.D.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:12-CV-1059-O (BH)** |
| | § | |
| **CAROLYN W. COLVIN, ACTING** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge** |

<u>**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**</u>

Pursuant to *Special Order No. 3-251*, this case was automatically referred for proposed findings of fact and recommendation for disposition.  Before the Court are *Plaintiff's Motion for Summary Judgment*, filed July 5, 2012 (doc. 19), and *Defendant's Motion for Summary Judgment*, filed August 6, 2012 (doc. 20).  Based on the relevant filings, evidence, and applicable law, Plaintiff's motion should be **DENIED**, Defendant's motion should be **GRANTED**, and the case should be wholly **AFFIRMED**.

## I.  BACKGROUND[1]

### A.    <u>Procedural History</u>

The grandmother of Z.D., a minor (Plaintiff), seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim on behalf of Plaintiff for supplementary security income (SSI) under Title XVI of the Social Security Act.  (R. at 1–5.)  She

---

[1]  The background comes from the transcript of the administrative proceedings, which is designated as "R."

applied for SSI for Plaintiff on February 23, 2010, alleging disability beginning January 23, 2010, due to Maple Syrup Urine Disease (MSUD). (R. at 112–18). The claim was denied initially and upon reconsideration. (R. at 18, 60–67.) The grandmother requested a hearing before an Administrative Law Judge (ALJ), and on December 7, 2010, she and Plaintiff's mother testified before an ALJ. (R. at 36–55, 76–80.) On August 25, 2011, the ALJ issued his decision finding Plaintiff not disabled. (R. at 18–32.) The Appeals Council denied a request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1–5.) The grandmother timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g). (doc. 1.)

**B.**     **Factual History**

**1.**     **Age, Education, and Work Experience**

Plaintiff was born on January 23, 2010. (R. at 57.) She was 10 months old at the time of the hearing before the ALJ. (*Id.*) As a minor, she has no education or past relevant work.

**2.**     **Medical Evidence**

Plaintiff's relevant medical history begins on January 26, 2010, three days after her birth, when she was diagnosed with MSUD.[2] (R. at 155, 171.) Immediately after her diagnosis, Pedro Ruey Ming Yen, M.D., her treating physician at Children's Medical Center (CMC), prescribed her "Ketonex," a protein-free formula to lower her amino acid levels. (*Id.*) That same day, Lewis J. Waber, M.D., a metabolic specialist at CMC's Genetics and Metabolism Clinic, and Katherine Green, a clinical dietician, met with Plaintiff's mother to discuss her diet and treatment regimen.

---

[2] "MSUD is a disorder of branched chain amino acid metabolism." (R. at 171.) "Affected children have elevated levels of the three branched chain amino acids: leucine, isoleucine, and valine." (*Id.*) The level of leucine, the most toxic amino acid, is maintained at less than 600. (*Id.*)

(R. at 172.)

On February 9, 2010, Plaintiff was hospitalized at CMC due to an upper respiratory infection. (R. at 155, 168.) She had difficulty breathing, a cough, and congestion. (R. at 156.) Doctors transferred her to the intensive care unit, placed her on a ventilator, and administered antibiotics. (R. at 157, 179.) Audra L. McCreight, M.D., an examining physician, found that she had "[n]o fever." (R. at 168.) The final diagnoses were RSV bronchiolitis and MSUD. (R. at 156.) The record contains extensive treatment notes relating to Plaintiff's hospitalization, including placement and adjustment of feeding tubes, her vital signs, and nurses' and doctors' observations. (*See* R. at 206–1065.) She was discharged on February 21, 2010. (R. at 175.)

On March 2, 2010, Dr. Waber saw Plaintiff for a follow-up consultation. (R. at 152.) He noted her hospitalization for RSV and found that her health had been stable since her discharge. (*Id.*) Her mother was "pleased with [her] progress" and knew how to prepare her dietary formula. (*Id.*) Plaintiff "appear[ed] well-developed and well-nourished," was active and alert, had a "strong cry," and was in no distress. (R. at 154.) She had normal strength, reflexes, and muscle tone. (*Id.*) With her average daily weight gain of 57 milligrams, she was "exceeding weight gain expectations for [her] age." (*Id.*) Dr. Waber opined that she was at a "mild" nutritional risk, given her MSUD and "need for [a] metabolic formula", but he found that her formula was appropriate and meeting her nutritional needs. (*Id.*) He scheduled a follow-up appointment in six months. (R. at 155.)

On March 18, 2010, Plaintiff's amino acid levels were leucine 659, isoleucine 554, and valine 135. (R. at 1092.) Dr. Waber increased her valine dose, and Plaintiff's mother "demonstrated her understanding" of the adjustment. (R. at 1090.) By April 23, 2010, Plaintiff's levels remained stable, and her mother reported she was "healthy and doing well." (R. at 1108.) Ms. Green encouraged her to continue Plaintiff's diet and keep her away from germs to prevent an illness. (*Id.*)

The following week, Plaintiff's levels rose and were leucine 1,115, valine 610, and isoleucine 595. (R. at 1113.) Ms. Green adjusted her formula and advised her mother to take her to the emergency room if she became lethargic. (R. at 1115.)

On April 26, 2010, Robin Rosenstock, M.D., a state agency medical consultant (SAMC), reviewed Plaintiff's medical evidence and completed a Childhood Disability Evaluation Form (CDEF). (R. at 192–93.) The primary diagnosis was MSUD. (R. at 192.) Dr. Rosenstock determined that Plaintiff had no limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for herself. (R. at 194–95.) She opined Plaintiff was markedly limited in the health and physical well-being domain. (R. at 195.) She concluded that Plaintiff's MSUD did not meet, medically equal, or functionally equal a listed impairment. (R. at 192.) In reaching her findings, Dr. Rosenstock acknowledged Plaintiff's hospitalization due to RSV. (R. at 195.) She referenced Dr. Waber's findings from March 2, 2010, that a physical examination was unremarkable and Plaintiff was "currently stable and on the appropriate formula." (R. at 152, 195, 1080.)

By May 6, 2010, Plaintiff's levels were leucine 625, isoleucine 237, and valine 85. (R. at 1116.) A week later, her levels were considerably lower. (*See* R. at 1119.) During the first three weeks of June, her leucine levels fluctuated between 751 and 1,043, and her isoleucine and valine levels fluctuated between 297 and 548. (R. at 1125–32.)

On June 10, 2010, Patricia Nicol, M.D., another SAMC, reviewed Plaintiff's medical evidence and also completed a CDEF. (R. at 198–203.) The primary diagnosis was MSUD. (R. at 198.) Dr. Nicol determined Plaintiff had no limitations in the first five functional domains and had a "less than marked limitation" in the health and physical well-being domain. (R. at 200–01.) She concluded Plaintiff's MSUD did not meet, medically equal, or functionally equal a listed

- 4 -

impairment.  (R. at 202.)  In her comments, Dr. Nicol noted Plaintiff's hospitalization for RSV in February 2010 and referenced Dr. Waber's March 2, 2010 findings that she was "currently stable" with her formula and was "[g]rowing and developing normally."  (R. at 152, 202, 1080.)

By the end of June 2010, Plaintiff's levels were considerably low.  (*See* R. at 1133.)  In early July, her levels varied from 430 to the low 700's.  (*See* R. at 1134–45.)  On August 10, 2010, her levels were leucine 28, isoleucine 187, and valine 90.  (R. at 1146.)  Ms. Green adjusted her formula and added to her diet six tablespoons of rice cereal, one jar of squash and one jar of sweet potato baby food.  (R. at 1147–48.)  The next week, Ms. Green added one jar of banana baby food to Plaintiff's diet.  (R. at 1151.)  Plaintiff's amino acid levels were in the mid 400's.  (R. at 1152.)

Dr. Waber saw Plaintiff again on September 8, 2010.  (R. at 1160.)  He found that Plaintiff "ha[d] been in good health with normal development to date."  (*Id.*)  Her daily diet consisted of her prescription formula, six scoops of rice cereal, one jar of sweet potato, one jar of squash, and one jar of banana baby food.  (*Id.*)  She took a daily dose of 4 milliliters of valine.  (*Id.*)  She "appear[ed] well-developed and well-nourished," and was alert, active, and in no distress.  (*Id.*)  She had normal strength, reflexes, and muscle tone.  (*Id.*)  Her appetite was good and her activity schedule was "normal for her age."  (R. at 1164.)  Dr. Waber found her growth was "acceptable" and her amino acid levels were "within treatment range."  (R. at 1165.)  Despite fluctuations in her amino acid levels, "she ha[d] done well" with her treatment, and Dr. Waber had "[n]o concerns" about her development.  (R. at 1160–63.)  Dr. Waber opined she was at a moderate nutritional risk due to her MSUD and her need for a protein-restricted diet and metabolic formula.  (R. at 1165.)  Plaintiff's mother "express[ed] excellent understanding of [her] treatment regimen and [was] pleased with [her] progress."  (R. at 1163.)  Dr. Waber explained that given her growth, she would "be more mobile and taking table foods."  (*Id.*)  Overall, he was "pleased with how [Plaintiff] was doing."  (*Id.*)

From September 28 to October 20, 2010, Plaintiff's leucine levels fluctuated between 692 and 1135.  (R. at 1171–77.)  On October 20, 2010, Plaintiff's mother told Ms. Green she had been "more sleepy than usual and had a runny nose" but was "otherwise normal appearing."  (R. at 1177–78.)  Ms. Green decreased her protein intake to two or three grams per day and continued her current formula.  (R. at 1178.)  On November 9, 2010, Plaintiff's levels were: leucine 152, valine 114, and isoleucine 44.  (R. at 1183.)  Her levels remained low from November 9, 2010 to February 3, 2011.  (*See* R. at 1183–1202.)

On December 3, 2010, Ms. Green completed a "Medical Source Statement" (MSS).  (R. at 204.)  The statement was a questionnaire of 14 multiple choice and true or false questions.  (*See id.*)  In her responses, Ms. Green indicated that MSUD is a rare, life-threatening disease; Plaintiff underwent weekly blood tests to monitor her amino acid levels and took a special man-made formula; benign conditions such as stress, lack of food, or fevers can result in brain damage and death; repeated episodes of physical stress can lead to mental retardation; MSUD complications can cause coma, death, or brain damage; Plaintiff had a personal dietician that adjusted her formula on a weekly basis; Plaintiff had been hospitalized for a fever; and Plaintiff required therapy twice a month for deficient motor skills.  (*Id.*)  She indicated that at the time, Plaintiff did not have any of the common MSUD symptoms, i.e., feeding difficulties, lethargy, seizures, and vomiting.  (*Id.*)  Her only handwritten notations state that "[i]f diet is not controlled, leucine levels will build up in the blood and cause lethargy and vomiting," and may result in coma or death.  (*Id.*)

Dr. Waber completed the same questionnaire and gave the same responses as Ms. Green.  (*See* R. at 205.)  In addition, he indicated that Plaintiff did not at the time have the common MSUD symptoms, but wrote that she "could have all."  (*Id.*)  He also indicated that MSUD is a permanent condition and Plaintiff must strictly adhere to her prescribed diet for the rest of her life.  (*Id.*)

On February 3, 2011, Plaintiff's mother took her to CMC, where she was diagnosed with an ear infection and a sore throat. (R. at 1202–07.) She had no fever, vomiting, lethargy, or gait disturbance. (R. at 1207.) The following week, her leucine level rose to 1,071. (R. at 1212.) By February 15, 2011, her leucine level peaked at 1,758. (R. at 1215.) Ms. Green adjusted her formula, reduced her protein intake to 5 grams per day, and prescribed her protein-free, high-sugar foods. (R. at 1217.) By March 1, 2011, her levels were very low. (R. at 1219.)

Dr. Waber examined Plaintiff on April 26, 2011. (R. at 1354–60.) He opined that her low-protein diet and Ketonex-1 supplement were adequate. (R. at 1354.) He found she "continue[d] to develop well." (Id.) She was "[e]ating all kinds of low protein foods" and appeared well-nourished. (R. at 1354, 1356.) She was active and alert, and had normal reflexes and coordination. (R. at 1356–57.) Her mother "was pleased with her progress." (R. at 1354.) Dr. Waber continued her diet and formula. (R. at 1358.)

By July 13, 2011, Plaintiff's amino acid levels were "unstable." (R. at 1346.) She was hospitalized on July 15, 2011, due to "ketonuria" and seizures. (R. at 1330, 1344.) She had no fever, chills, or pain. (R. at 1340.) Plaintiff's mother told physicians that she had been sleeping all day and had decreased activity, "which [was] unlike her," had muscle spasms, and was "unsteady and wobbly." (R. at 1338.) Her amino acid levels were isoleucine 393, leucine 1,099, and valine 637. (R. at 1331.) A computed tomography (CT) scan revealed subtle edema in the dorsal brainstem and deep cerebellar white matter, which were "consistent with MSUD crisis." (R. at 1328.) It was also noted that this condition "cause[d] no mass effect." (R. at 1307, 1329.) Justin Jordan M.D., an examining physician, opined that the cause of plaintiff's seizures was "not entirely clear." (R. at 1307.) He found it "surprising that she [was] developing seizures [after] her ketones ha[d] cleared." (Id.) He further opined that the edema was "likely related" to her MSUD and ataxia, but it was "not

likely the cause of her seizures." (*Id.*)  By July 18, 2011, Plaintiff's ataxia had improved and her seizures had dissipated.  (R. at 1302.)  She was hemodynamically stable, alert, smiling, interactive, and in no acute distress.  (R. at 1302, 1308.)  She "was up and playful" in the morning and could sit and stand without assistance.  (R. at 1302, 1305.)

During an follow-up consultation at CMD on October 4, 2010, Rana R. Said, M.D., the evaluating physician, opined that Plaintiff had no need for an antiepileptic medication since she had "only a single seizure."  (R. at 1295.)

On November 1, 2011, Plaintiff's last visit to Dr. Waber's office on file, her mother reported she had been sick for the past few days.  (R. at 1290.)  She could not walk normally the day before and was fussy and "somewhat wobbly" that day.  (*Id.*)  Dr. Waber opined that "her development [was] normal."  (R. at 1288, 1292.)  He noted Plaintiff was "working on potty training" and had "good speech development."  (R. at 1288.)  She appeared well-developed and well-nourished.  (R. at 1289.)  She was active and had normal reflexes, muscle tone, and coordination.  (R. at 1290.)  Dr. Waber was "concerned about her frequently high levels" and counseled her mother about managing her diet.  (R. at 1291.)  He scheduled a follow-up appointment in six months.  (*Id.*)

### 4.    Hearing Testimony

On December 7, 2010, Plaintiff's mother and grandmother testified at the hearing before the ALJ.  (R. at 38–55.)  Plaintiff was represented by an attorney.  (*Id.*)

#### a.    The Mother's Testimony

Plaintiff's mother testified that Plaintiff was born on January 23, 2010, and was 10 months old at the time of the hearing.  (R. at 40–41.)  Plaintiff saw Ms. Green, her dietician, every six months.  (R. at 42.)  She last saw Ms. Green in February 2010, when she was hospitalized due to RSV.  (*Id.*)  The doctors did not know what caused her RSV and told her mother that she "just got

sick." (R. at 43.) She was hospitalized for two weeks and was placed on a ventilator. (R. at 44.) Plaintiff had never had a surgery. (*Id.*)

Plaintiff lived with her mother and older brother. (*Id.*) Her father did not contribute to their support. (*Id.*) Plaintiff was covered by Medicaid, and her mother received $200 a month in food stamps. (R. at 46.) Plaintiff's mother worked as a waitress but was "getting ready to resign, to be a stay at home mom and take care of [the] kids." (*Id.*)

Plaintiff last saw her pediatrician at Pedriatric Clinic of Mesquite the previous month. (*Id.*) On average, Plaintiff saw her pediatrician every two or three months. (*Id.*) Although no professional had evaluated Plaintiff and opined about her development, her mother believed she was not developing normally and was "not doing things at her age that she should be doing." (R. at 47–48.) For instance, she did not play with toys. (R. 48.)

In response to counsel's question, Plaintiff's mother testified that Plaintiff's MSUD was incurable. (R. at 49.) Plaintiff underwent weekly blood tests to monitor her amino acid levels and adjust her formula and diet. (*Id.*) Plaintiff slept all day when her amino acid levels were high. (R. at 50.) When her levels were normal, she could crawl and "babble." (*Id.*)

Plaintiff never played with toys and was slow at responding to her name. (*Id.*) She did not understand the meaning of common words such as yes and no. (R. at 51.) If her mother grabbed the keys or the car seat, Plaintiff did not understand that meant they were going out. (*Id.*) She did not react to common sounds like a telephone ring. (*Id.*) She never tried to get her mother's attention with gestures or some kind of vocalization. (R. at 52.) It was difficult for her to pick up objects and put them in a container. (*Id.*) She could stand only if she held on to something and doctors thought she might need braces on her feet because she stood "outward." (*Id.*) Her dietary formula cost about $800 per month. (R. at 53.)

### b.    *The Grandmother's Testimony*

Plaintiff's grandmother testified that Plaintiff's MSUD was a very rare disease and was difficult to control.  (R. at 54.)  Her protein and amino acid levels had to be constantly monitored.  (*Id.*)  They never knew if Plaintiff was "going to wake up or not" because her MSUD could cause her seizures, coma, or even "death in her sleep if her levels happen[ed] to skyrocket in the middle of the night."  (*Id.*)

## C.    ALJ's Findings

The ALJ denied Plaintiff's application for benefits by written opinion on August 25, 2011.  (R. at 18–32.)  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity during the relevant time period.  (R. at 21.)  At step two, the ALJ found that Plaintiff's MSUD was a severe impairment.  (*Id.*)  At step three, the ALJ determined that Plaintiff's MSUD did not meet, medically equal, or functionally equal an impairment listed in the regulations.  (*Id.*)  Accordingly, the ALJ concluded that Plaintiff was not disabled, as defined by the Social Security Act, between the date of her application and the date of the ALJ's decision.  (R. at 31–32.)

## II.    ANALYSIS

## A.    Legal Standards

### 1.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558,

564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not

reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the

record to determine whether substantial evidence supports the Commissioner's decision.

*Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a

conspicuous absence of credible evidentiary choices or contrary medical findings to support the

Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

      The scope of judicial review of a decision under the supplemental security income program

is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759

F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the

determination of disability under a claim for disability insurance benefits are identical to those

governing the determination under a claim for supplemental security income.  *See id.*  The Court

may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision.  *See id.*

**2.**        **Disability Determination**

      To be entitled to social security benefits, a claimant must prove that he or she is disabled as

defined by the Social Security Act.  *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638,

640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v.*

*Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).  The Commissioner utilizes a sequential three-step

inquiry to determine whether a child is disabled and entitled to monthly benefits under the Social

Security Act:

      1.       A child who is working and engaging in substantial gainful activity will not

be found disabled regardless of medical findings.

2.      A child who does not have a "severe impairment" will not be found to be disabled.

3.      A child whose impairment "meets, medically equals, or functionally equals" a listed impairment in the regulations will be considered disabled.

20 C.F.R. § 416.924(a) (2011).  If the ALJ finds a severe impairment, he or she must then consider whether the impairment meets, "medically equals," or "functionally equals" a listed disabling impairment.  20 C.F.R. § 416.924(c)–(d).

In determining whether a child's impairment functionally equals a listed disability, the impairments are evaluated for severity in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).  In evaluating a child's ability to function in each domain, the Commissioner determines (1) the activities the child is able to perform; (2) the activities the child is not able to perform; (3) which of the child's activities are limited or restricted compared to children of the same age who do not have impairments; (4) whether the child has difficulty with activities at home, in childcare, at school, or in the community; (5) whether the child has difficulty independently initiating, sustaining, or completing activities; and (6) the type, how much, and how often the child needs assistance to accomplish his or her activities.  20 C.F.R. § 416.926a(b)(2).

If the evidence shows that a child's impairment "seriously" interferes with his or her ability to independently initiate, sustain, or complete activities, the impairment is considered "marked." 20 C.F.R. § 416.926a(e)(2)(i).  If the evidence shows the child's impairment "very seriously" interferes with his or her ability to independently initiate, sustain, or complete activities, the impairment is "extreme."  20 C.F.R. § 416.926a(e)(3)(i).  To establish functional equivalence, the

child must exhibit a "marked" limitation in two of the six domains, or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(a).

**B.**     <u>Issues for Review</u>

Plaintiff presents four issues for review:

(1)     The decision must be remanded because the finding that the plaintiff had only a marked restriction in the domain of health and physical well being was not based on substantial evidence and contains errors or law;

(2)     The decision must be remanded because the required credibility assessment was not completed;

(3)     The decision must be reversed for payment of benefits because of the plain legal error of failing to process the plaintiff's claim as a compassionate allowance ("CAL"); [and]

(4)     The decision must be remanded because the finding that the plaintiff's impairment did not meet or functionally equal a listing was not based on substantial evidence and contains errors of law.

(Pl. Br. at 2.)

**C.**     <u>Treating Source Opinions</u>[3]

Plaintiff argues that the ALJ erred in finding that she had a marked, rather than an extreme, limitation in the domain of health and physical well-being, in part because he failed to give any weight or consideration to the treating opinions of Dr. Waber, her metabolic specialist, and Ms. Green, her clinical dietician.  (Pl. Br. at 9–10.)

**1.**     *Dr. Waber's Opinions*

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence.  20 C.F.R. §§ 404.1520b(b) and 404.1527(c) (2012).  Every medical

---

[3] Plaintiff's contention that the ALJ "failed to give any weight or consideration" to Dr. Waber's and Ms. Green's treating opinions when assessing her limitations in the domain of health and physical well-being implicates the "treating physician rule."  (*See* Pl. Br. at 10.)  Although she includes this argument as part of her first issue, it is addressed first, separately because its resolution impacts the resolution of some of her other issues.

opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source.  20 C.F.R. § 404.1527(c)(1) (2012).  A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with the claimant.  *Id.* § 404.1502.  When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. 20 C.F.R. § 404.1527(c)(2); *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).  If controlling weight is not given to a treating source's opinion, the Commissioner applies six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion."  20 C.F.R. § 404.1527(c)(1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ.  *Newton*, 209 F.3d at 455.  If evidence supports a contrary conclusion, an opinion of any physician may be rejected.  *Id.*  A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence."  *Id.* at 455–56.  Ordinarily, "absent reliable medical evidence from a treating or

examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion

of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's

views under the criteria set forth in [20 C.F.R. § 404.1527(c)]." *Id.* at 453 (emphasis in *Newton*).

A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence

and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another,"

or when the ALJ has weighed "the treating physician's opinion on disability against the medical

opinion of other physicians who have treated or examined the claimant and have specific medical

bases for a contrary opinion." *Id.* at 458.

Here, Waber's December 6, 2010 MSS was a "treating source" statement subject to the six-

factor analysis under 20 C.F.R. § 404.1527(c).  *See* 20 C.F.R. § 404.1502.  In reaching his disability

determination, the ALJ stated that he considered the "opinion evidence" in accordance with 20

C.F.R. §§ 404.1527 and 416.927.  (R. at 21, 25.)  The ALJ summarized Dr. Waber's answers in his

MSS[4] but he did not indicate what weight, if any, he gave to this evidence.  (*See* R. at 18–32, 205.)

Information analogous to Dr. Waber's indications in items 1, 2, 4, 5, 6, 10, and 11 (i.e., Plaintiff's

MSUD diagnosis, her weekly blood tests, her need for a prescription formula, etc.) is included

throughout the record.  The ALJ expressly cited and even relied on many of these treatment notes.

(*See* R. at 23, 154–55.)  Accordingly, the ALJ could not be said to have rejected these opinions.

---

[4] Dr. Waber's MSS consisted of 13 multiple choice and true or false questions.  (*See* R. at 205.)  He responded as follows: (1) Plaintiff suffered from MSUD; (2) he considered MSUD to be a rare disease; (3) he considered MSUD to be life-threatening; (4) Plaintiff underwent weekly blood tests to monitor her amino acid levels and adjust her "special man made formula"; (5) MSUD is a permanent illness and Plaintiff must adhere to her prescription diet for the rest of her life; (6) benign conditions such as stress and fevers can cause a rapid build-up of dangerous amino acids; (7) repeated episodes of physical stress can cause mental retardation; (8) during episodes of rapid amino acid build-up, drastic measures, such as peritoneal dialysis, may be necessary; (9) Plaintiff was not experiencing any of the common MSUD symptoms (i.e., feeding difficulties, lethargy, seizures, and vomiting), but she "could have all"; (10) possible MSUD complications include comma, brain damage, and death; (11) Plaintiff had a personal dietician who adjusted her formula on a weekly basis; (12) Plaintiff had been hospitalized when suffering only a fever; and (13) Plaintiff required therapy twice a month for deficient motor skills.  (R. at 205.)

To the extent the ALJ rejected without discussion Dr. Waber's opinions in items 3, 7, and 8 that MSUD was a life-threatening illness and could result in mental retardation, brain damage, and death, etc., Dr. Waber did not indicate that any of those conditions applied to Plaintiff, and he even stated that she was not experiencing any of the common MSUD symptoms at the time.  Any error was therefore harmless.  (*See* R. at 205); *see also McNeal v. Colvin*, No. 3:11-CV-02612-BH-L, 2013 WL 1285472, at *27 (N.D. Tex. Mar. 28, 2013) (applying harmless error analysis to the ALJ's failure to properly evaluate treating opinion under 20 C.F.R. §§ 404.1527(c)); *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (in the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

As for Dr. Waber's indication in item 12 that Plaintiff was hospitalized when suffering from a fever, this opinion was unsupported because treatment notes from the two hospitalizations on file show that Plaintiff was admitted for conditions other than a fever.  She was first hospitalized on February 9, 2010, due to bronchiolitis and RSV, an upper respiratory infection.  (R. at 168.)  While she had difficulty breathing, a cough, and congestion, Dr. McCreight wrote that Plaintiff had "[n]o fever."  (R. at 156, 168.)  Further, physicians noted her history of MSUD (*see, e.g.*, R. at 160), but nothing in the voluminous treatment notes shows a physician opining that Plaintiff's MSUD caused her RSV or was otherwise the cause for her hospitalization.  (*See* R. at 206–1065.)  Likewise, no physician appears to have indicated that Plaintiff's RSV resulted from a fever.  (*See id.* )  Plaintiff's mother testified that the doctors did not know what caused her RSV and stated that she "just got sick."  (R. at 43.)  In July 2011, Plaintiff was hospitalized for ketonuria and seizures.  (R. at 1346.)  She had lethargy, fatigue, and a decreased appetite but "no fever", chills, or pain.  (R. at 1340.)

Accordingly, the ALJ was free to reject Dr. Waber's opinion that Plaintiff had been hospitalized for suffering from only a fever without conducting a factor-by-factor analysis because it was unsupported by the evidence. *See Newton*, 209 F.3d at 455.

In addition, despite Dr. Waber's indication that Plaintiff required physical therapy twice a month for her deficient motor skills, nothing in the record indicates that he, or any other physician, referred her to physical therapy, or that Plaintiff otherwise received such therapy. Dr. Waber consistently opined that Plaintiff was well-developed and well-nourished. (*See* R. at 152–55, 205, 1160–65.) On at least three occasions, he found that Plaintiff had normal strength, reflexes, and muscle tone, and he had no concerns about her development. (R. at 154, 1164, 1290.) On November 1, 2011, he also opined she had normal coordination. (R. at 1290.) Accordingly, the ALJ could reject this opinion without a formal analysis because there was competing first-hand medical evidence, including Dr. Waber's own treatment notes, that supported a contrary conclusion. *See See Newton*, 209 F.3d at 455; *Chater*, 67 F.3d at 566. The ALJ's assessment of Dr. Waber's opinions utilized the proper legal standards and is supported by substantial evidence.

### 2. *Ms. Green's Opinions*

As a clinical dietician, Ms. Green was not an "acceptable medical source"and her opinions were therefore not medical opinions. See 20 C.F.R. § 404.1513(a) (2011) (medical sources include physicians, psychologists, optometrists, and other licensed medical professionals), § 404.1527(a)(2) (2011) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources...."). Notably, she was not a "treating source" for purposes of a disability analysis. *See* Social Security Ruling (SSR) 06–03R, 2006 WL 2329939, at *4 ("only 'acceptable medical sources' can be considered treating sources").

- 17 -

Ms. Green completed the same MSS as Dr. Waber.  (R. at 204.)  She gave the same answers

as Dr. Waber, with two exceptions: (1) she did not answer item 5 (whether MSUD is a permanent

condition) and (2) she made handwritten notations that if the patient's diet is not controlled, the

leucine level builds up in the blood and causes lethargy and vomiting, which could lead to coma and

death if the levels are not lowered quickly enough.  (*See id.*)

The ALJ summarized Ms. Green's MSS, but he did not explain what weight, if any, he gave

to her opinions.  (R. at 23).  Although the ALJ was required to consider Ms. Green's opinions, along

with all the other evidence in the record, he was not required to give them any weight or analyze

them under 20 C.F.R. §§ 404.1527(c) and 416.927(c).  *See Berry v. Astrue*, No. 3:11-CV-02817-L

BH, 2013 WL 524331, at *19 (N.D. Tex. Jan. 25, 2013), *rec. adopted*, 2013 WL 540587 (N.D. Tex.

Feb. 13, 2013).  Accordingly, the ALJ did not err in evaluating Ms. Green's opinions regardless of

the weight he may have accorded them.  *See id.* at *19–20; (finding no error where the ALJ rejected

the opinions of the claimant's counselor because she was "not an 'acceptable medical source'").

In conclusion, the ALJ's assessments of Dr. Waber's and Ms. Green's opinions are supported

by substantial evidence, and remand is therefore not required on this issue.

## D.  **Failure to Identify a Listing**[5]

Plaintiff argues that the ALJ erred because he did not identify the Listings that he considered

in finding that her MSUD did not meet, medically equal, or functionally equal a listed impairment,

and he did not explain how he reached that conclusion.  (Pl. Br. at 20).  She contends the ALJ's error

was not harmless and requires remand because she met Listing 111.06.  (*Id.* at 21.)

---

[5]  Although Plaintiff lists and briefs this issue last, it is addressed before her other issues because the ALJ's
identification of a listing that is analogous to the claimant's unlisted impairments occurs earlier in the disability
sequential analysis.

"At step three, the regulatory test for disability is met if a claimant's impairments fully satisfy the severity criteria for an impairment listed in Appendix 1 to Subpart P of Part 404 of the regulations." *Inge ex rel. D.J.I. v. Astrue*, No. 7:09-CV-95-O, 2010 WL 2473835, at *9 (N.D. Tex. May 13, 2010), *rec. adopted*, 2010 WL 2473598 (N.D. Tex. June 16, 2010); *see also* 20 C.F.R. § 416.924(a).  If the claimant's impairment or combination of impairments meets, medically equals, or functionally equals a listed impairment, the disability inquiry ends, and the claimant is entitled to benefits.  20 C.F.R. § 416.924(a).  To equal a listing, the claimant's unlisted impairment or combination of impairments must be "at least equal in severity and duration to the criteria of any listed impairment."  *Id.* § 404.1526(a).  The claimant shows that her unlisted impairments is medically "equivalent" to a listed impairment by presenting medical findings equal in severity to *all* the criteria for the most analogous listed impairment.  *Id.* § 404.1526(b)(2); *Sullivan v. Zebley*, 493 U.S. 521, 529–31 (1990).  The ALJ must consider all of the evidence that is relevant to the claimant's impairments and their effects on the claimant, but must not consider vocational factors such as age, education, and work experience.  20 C.F.R. § 416.926(c).  "[T]he responsibility for deciding medical equivalence rests with the [ALJ]."  *Id.* § 416.926(e).

### 1.    *Listing 111.06*

Here, Plaintiff contends that her MSUD was severe enough to meet Listing 111.06.  ( Pl. Br. at 21.)  She essentially argues that she had a deficit of motor function involving two extremities that interfered with her age-appropriate major daily activities and resulted in disruption of fine and gross movements, or gait and station.  (*Id.*)

Listing 111.06 provides:

111.06 Motor dysfunction (due to any neurological disorder). Persistent disorganization or deficit of motor function for age involving two extremities, which

- 19 -

(despite prescribed therapy) interferes with age-appropriate major daily activities and results in disruption of:

A. Fine and gross movements; or

B. Gait and station.

20 C.F.R. Part 404, Subpt. P, App. 1, § 111.06 (2013).[6]

At step three, the ALJ determined that Plaintiff's MSUD did not meet, medically equal, or functionally equal a listed impairment.  (R. at 21.)  After summarizing the medical evidence, including Dr. Waber's and Ms. Green's opinions, and making a credibility determination, the ALJ determined that Plaintiff had no limitations in the first five functional domains and had a marked limitation in the domain of health and physical well-being.  (*See* R. at 21–32.)  Because Plaintiff did not have two marked limitations or one extreme limitation, the ALJ concluded she was not disabled. (*Id.*)  While the ALJ provided an explanation based on the evidence for his finding that Plaintiff's MSUD did not functionally equal a listed impairment, he did not expressly compare it to Listing 111.06 or any other Listing.  (*See id.*)

### 2.   *Error*

Plaintiff argues that the ALJ's failure to compare Plaintiff's MSUD to a specific Listing was legal error under *Audler*.  (Pl. Br. at 20–21.)

In *Audler*, the Fifth Circuit held that the ALJ committed legal error because she "summarily concluded" that the claimant's impairments were not severe enough to meet or medically equal one of the listed impairments but she "did not identify the listed impairment for which [the plaintiff's] symptoms fail[ed] to qualify, *nor did she provide any explanation* as to how she reached the

---

[6]  Although App. 1 has been updated since Plaintiff filed suit, § 111.06 remains the same.

conclusion that [the claimant's] symptoms [were] insufficiently severe to meet any listed impairment." *Audler*, 501 F.3d at 448 (emphasis added). Here, unlike *Audler*, the ALJ discussed the evidence of record and provided reasons for his step three finding. (*See* R. at 21–31); *see also* 42 U.S.C.A. §405(b)(1) (2010) (providing that the ALJ's decision must "contain a statement of the case, ... setting forth a discussion of the evidence, and stating [his] determination and the reason or reasons upon which it is based"). Accordingly, there was no legal error under *Audler.*

Even if the ALJ erred by failing to compare Plaintiff's MSUD to a specific Listing, the Court must still consider whether the error was harmless. *See Audler*, 501 F.3d at 448 ("Having determined that the ALJ erred in failing to state any reason for her adverse determination at step 3, we must still determine whether this error was harmless."). As noted, legal error is harmless when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette*, 466 F. Supp. 2d at 816.

Plaintiff essentially argues that the ALJ's error was not harmless because the ALJ ignored evidence showing that her MUSD met the severity criteria of Listing 111.06. (P. Br. at 21.) The Commissioner responds that any step three error was harmless because "there is uncontradicted medical evidence that [Plaintiff] does not meet [the required] criteria." (D. Br. at 19.)

Plaintiff points to Dr. Waber's notation that Plaintiff "*require[d]* therapy twice a month for deficient motor skills." (R. at 205) (emphasis added). As discussed, the ALJ was entitled to disregard this opinion as unsupported by the record. Dr. Waber consistently found that Plaintiff appeared well-developed and she had normal strength, reflexes, and muscle tone. (R. at 154, 1160, 1290.) On November 1, 2011, despite her mother's complaints that she was not walking normally the day before and was somewhat wobbly that day, Dr. Waber opined that she was well developed

and had normal coordination.  (R. at 1290.)  He noted she was working on potty training.  (R. at 1290.)  In February 2011, while treating her for an ear infection and a sore throat, a CMC physician noted that Plaintiff had no gait disturbance.  (R. at 1207.)  On July 18, 2011, after her seizures dissipated, she was "playful" and could sit and "stand without assistance."  (R. at 1305.)

Plaintiff also relies on her mother's testimony that her motor control and gait were disrupted when her amino acid levels rose.  (R. at 52.)  As discussed more fully below in the section relating to the ALJ's credibility findings, the ALJ could discredit the mother's testimony if he found it to be unsupported by the medical evidence.  The only references in the medical evidence to Plaintiff's motor deficits are her mother's statements to Dr. Waber on November 1, 2011, that she was not walking normally and was "somewhat wobbly", and her statements to CMC physicians on July 15, 2011, that Plaintiff was "unsteady and wobbly" and had muscle spasms.  (R. at 1338.)  These two isolated instances arguably fall short of Listing 111.06's requirement that the claimant's deficit be "persistent."  *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 111.06.

Because the record as a whole does not indicate that Plaintiff had a persistent deficit of motor function that interfered with her age-appropriate major motor activities, it is inconceivable that the ALJ would have reached a different third step determination if he had compared Plaintiff's MSUD to Listing 111.06.  Accordingly, to the extent the ALJ erred in failing to identify a specific Listing at step three, the error was harmless and does not warrant remand.  *See Grays v. Colvin*, No. 3:12-CV-00138-B-BH, 2013 WL 1148584, at *12–13 (N.D. Tex. Mar. 19, 2013) (holding that the ALJ's step three error in failing to explain why the claimant's impairments did not meet or equal a listed impairment was harmless because the claimant's "medical evidence [fell] short of meeting his burden to show that his impairment" met the severity criteria of Listing § 1.00(B)(2)).

E.      **Health and Physical Well-Being Domain**

Plaintiff also argues that remand is required because the ALJ's finding that she had a marked,

rather than an extreme limitation in the domain of health and physical well-being is not supported

by substantial evidence and contains errors of law.  (Pl. Br. at 7.)   She claims she had an extreme

limitation in this domain because she was medically fragile due to her MSUD; for example, it

"resulted in a 13-day inpatient admission to the intensive care unit, requiring a ventilator and feeding

tube for survival, after suffering a mere fever."  (*Id.* at 9.)

To "functionally equal" a listing, the claimant's unlisted impairments must result in marked

limitations[7] in two of the six domains[8] of functioning or an extreme limitation[9] in one domain.  20

C.F.R. § 416.926a(a).   In the domain of health and physical well-being, the ALJ considers the

"cumulative physical effects of physical or mental impairments and their associated treatments or

therapies on [the claimant's] functioning" that were not considered in the evaluation of her ability

to move about and manipulate objects.  20 C.F.R. § 416.926a(l).  Examples of limitations in this

domain are: (1) generalized symptoms, such as weakness, dizziness, agitation, lethargy, and

psychomotor retardation; (2) somatic complaints related to an impairment, such as seizures or

convulsive activity, headaches, recurrent infections, allergies, nausea, headaches or insomnia; (3)

---

[7]  A "marked limitation" is one that "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2).  This limitation is "more than moderate" but "less than extreme." *Id.*

[8]  These domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects'; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(l).

[9]  An "extreme" limitation is one that "very seriously" interferes with the claimant's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation is "more than marked" and is given to the worst limitations. *Id.*  However, it "does not necessarily mean a total lack or loss of ability to function." *Id.*

limitations in physical functioning because of treatment, including chemotherapy, multiple surgeries, chelation, pulmonary cleansing, or nebulizer treatments; (4) exacerbations from an impairment that interfere with physical functioning; and (5) medical fragility requiring intensive medical care to maintain level of health and physical well being. 20 C.F.R. § 416.926a(l)(4)(i)–(v). These examples are non-exclusive and "do not necessarily describe a 'marked' or 'extreme' limitation." *Id.* § 416.926a(l)(4). "[T]he responsibility for deciding functional equivalence rests with the [ALJ]." *Id.* § 416.926a(n).

Here, the ALJ found that Plaintiff had a marked limitation in the domain of health and physical well-being. (R. at 31.) In reaching this determination, the ALJ acknowledged Plaintiff's diagnosis with MSUD. (R. at 31, 155.) Notably, upon her diagnosis, doctors placed on her a prescription Ketonex formula to lower her amino acid levels and she "responded well" to the treatment. (R. at 171, 1065.) The ALJ also acknowledged Plaintiff's hospitalization in February 2010 due to RSV. (R. at 31, 206–1065.) While physicians noted her MSUD diagnosis during that hospitalization, the record contains no evidence showing any physician opined that her MSUD was the cause of her RSV. (*See* R. at 206–1065.) Plaintiff's mother testified that physicians did not know what caused her RSV and simply stated that she "just got sick." (R. at 43.)

The ALJ also referenced Dr. Waber's notations from March 2, 2010, that a physical examination of Plaintiff was "unremarkable" and he would follow up in six months. (R. at 31, 152.) Dr. Waber also found that Plaintiff's health had been stable since she was released from the hospital on February 21, 2010. (R. at 152.) He found Plaintiff appeared well-developed and well-nourished, was active and alert, had a strong cry, and had normal strength, reflexes, and muscle tone. (*Id.*) She was gaining 57 milligrams a day and was "exceeding" the weight expectations for her age. (R. at

1080.) Dr. Waber opined that her nutritional risk was "mild". (*Id.*) He had no concerns about her development and her mother was pleased with her progress. (*Id.*) On September 8, 2010, Dr. Weber found that Plaintiff appeared well-developed and well nourished, was active and alert, and had normal strength, reflexes, and muscle tone. (R. at 1164.)

The ALJ also relied on Dr. Nicol's, a SAMC, evaluation, which he remarked was based on "the most current information in the record." (R. at 31.) Dr. Nicol reviewed the medical evidence and implicitly referenced Dr. Waber's opinions from March 2, 2010, that Plaintiff's health had been stable since her hospitalization, her formula was appropriate, and she was growing and developing normally. (R. at 201, 152–55.) Dr. Waber's notes of subsequent examinations contained similar observations to those in the notes reviewed by Dr. Nicol. (*See* R. at 1160–65,1287–91, 1354.)

Based on his own observations at the hearing, the ALJ expressly agreed with Dr. Nicol's finding that Plaintiff was "growing and developing normally." (R. at 31, 201.) The ALJ observed Plaintiff was "acting, moving, and responding to her surroundings as any 11-month-old child would have." (R. at 31.) Yet, he assigned her a marked limitation in the domain of health and physical well-being, which was a more restrictive finding than Dr. Nicol's. (*See* R. at 31, 200–201.)

The ALJ did not discuss, or even address, Plaintiff's hospitalization on July 15, 2011, due to ketonuria and seizures. (*See* R. at 31, 1329–38.) That day, her leucine level was 1,099. (R. at 1331.) Dr. Jordan stated that the cause of Plaintiff's seizures was "not entirely clear" and found it surprising that she was having seizures even after her ketones had cleared. (R. at 1307.) He opined that her edema was likely related to her MSUD and her ataxia, but it was "not likely the cause of her seizures." (*Id.*) Plaintiff had no fever. (R. at 1340.) Two days later, her ataxia had improved and she was up and playful and could sit and stand without assistance. (R. at 1305.) Her doctor found

- 25 -

no need for antiepileptic medication since she had "only a single seizure."  (R. at 1295.)

The record supports the ALJ's finding that Plaintiff had a marked limitation in the domain of health and physical well-being.  As he was required to do, the ALJ gave explanations based on the evidence to support his disability decision.  The ALJ's failure to mention Plaintiff's July 2011 was not erroneous because he was not "required to do an exhaustive point-by-point discussion."  *See Audler*, 501 F.3d at 448.  Even if his omission constituted error, it would not require reversal since substantial evidence in the record, including notes from treating sources, support his finding in this domain. *See Walker v. Astrue*, No. CIV.A. 3:09-CV-1900-BH, 2010 WL 910505, at *12 (N.D. Tex. Mar. 13, 2010) (While "[t]he ALJ's failure to support each functional domain with specific evidence may thwart meaningful review, ... if the Court can determine that substantial evidence supports the ALJ's findings regarding the six domains, failure to cite to [specific evidence in ] the record constitutes harmless error and does not require remand.") (citations omitted).  Because the ALJ's finding that Plaintiff had a marked limitation in this domain is supported by substantial evidence, remand is not required on this basis.[10]

## F.    Credibility Determination

Plaintiff asserts that the ALJ erred in failing to conduct a proper credibility assessment and give proper weight to her mother's testimony.  (Pl. Br. at 14–18.)

Credibility determinations by an ALJ are entitled to deference.  *See Carrier v. Sullivan*, 944

---

[10]  Plaintiff also argues that the ALJ should have found she had at least a marked limitation in the domains of acquiring and using information, interacting and relating with others, and moving about and manipulating objects. (Pl. Br. at 12–14.)  Because Plaintiff did not list this argument as a separate issue, it is deemed abandoned.  (*See* scheduling order (doc. 18) at 1.)  Even if considered, Plaintiff argument does not affect the outcome of this recommendation.  She primarily relies on her mother's testimony.  (*See* Pl. Br. at 12.)  As discussed in the following section, the ALJ could discredit the mother's testimony if he found it to be unsupported by the evidence, including her own statements to physicians.  Plaintiff also points to Dr. Waber's indication in his MSS that she required bi-weekly physical therapy for her motor skills deficit.  As discussed, no evidence in the record supports Dr. Waber's statement and his own treatment notes contradict it.

F.2d 243, 247 (5th Cir. 1991).  The ALJ is in the best position to assess a claimant's credibility because he "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco v. Shalala*, 27 F.3d 160, 164 n.18 (5th Cir. 1994).  In evaluating a claimant's subjective complaints, the ALJ must follow a two-step process. SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996). First, the ALJ must determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.*  Next, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities.  *Id.*  If the claimant's statements concerning the intensity, persistence, or limiting effects of those symptoms are not substantiated by objective medical evidence, the ALJ must assess the credibility of the claimant's statements.  *Id.*; *Falco*, 27 F.3d at 164 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1985)).

In assessing credibility, the ALJ must consider the entire record, including medical signs and laboratory findings and statements by the claimant and his treating or examining sources concerning the alleged symptoms and their effects.  SSR 96-7p, 1996 WL 374186, at *2.  Additionally, the regulations provide a non-exclusive list of factors that the ALJ must consider.  *See* 20 C.F.R. § 404.1529(c) (2011).[11]  The Fifth Circuit has held, however, that the ALJ is not required to follow "formalistic rules" in assessing credibility, and he must articulate his reasons for rejecting a claimant's subjective complaints only "when the evidence clearly favors the claimant." *Falco*, 27 F.3d at 163.

---

[11]  These factors are: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; (6) measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms."   20 C.F.R. § 404.1529(c);  SSR 96-7p, 1996 WL 374186, at *3.

Here, the ALJ cited the factors listed in 20 C.F.R. § 404.1529(c) and after considering and weighing the objective medical evidence and other evidence, he concluded that Plaintiff's "mother's statements concerning the intensity, persistence, and limiting effects of [Plaintiff's] symptoms [were] neither entirely credible, nor consistent with or supported by the preponderance of the medical and other evidence of record."  (R. at 22, 24–25.)

The ALJ referenced the mother's testimony that Plaintiff was diagnosed with MSUD soon after her birth, underwent weekly blood tests to monitor her amino acid levels and adjust her dietary formula, and did not play with toys or seem to be aware of things to the same extent as other children her age.  (R. at 22, 43, 47–48.)  Based on remarks made elsewhere in his decision, the ALJ did not reject the mother's testimony that Plaintiff had MSUD and required weekly blood tests and dietary formula adjustments.  (*See* R. at 23.)

To the extent the ALJ rejected the mother's testimony that Plaintiff did not play with toys and was not aware of things to the same extent as other children her age, he was not required to conduct a factor-by-factor analysis before rejecting these allegations because the evidence as a whole did not "clearly favor" Plaintiff.  *See Falco*, 27 F.3d at 163); *see also Clary v. Barnhart*, 214 F. App'x 479, 482 (5th Cir. 2007) ("The ALJ is *not* required to mechanically follow every guiding regulatory factor in articulating reasons for denying claims or weighing credibility.") (emphasis in *Clary*).  The ALJ pointed to his own observations at the hearing and clarified that they were only "one factor among many" in his credibility analysis.  (R. at 23.)  At the hearing, the ALJ observed Plaintiff was acting, moving, and responding to her surroundings in the same manner as any child her age would have.  (R. at 31.)  As discussed, on several occasions, Dr. Waber opined that Plaintiff's development was normal and he had no concerns.  (R. at 154, 1160, 1288, 1292.)  On July

18, 2011, while Plaintiff recovered from her seizure episode, a doctor noted that she was "up and playful" in the morning and could sit and stand without assistance. (R. at 1302.) A few days earlier, her mother had told physicians that her decreased level of activity was "unlike her." (R. at 1338.) The mother also testified that no professional had opined Plaintiff was not developing normally; these were her own observations. (R. at 47–48.) The ALJ could discredit the mother's statements if he found them to be unsubstantiated by the evidence. *See Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir.1995) (per curiam) (although the claimant "alleged a very limited activity level at the hearing," the ALJ's finding that her "complaints were not debilitating" was "supported by substantial evidence" where the ALJ determined that the allegations "were not consistent with the objective medical evidence") (citation omitted).

The ALJ gave sufficient reasons for his finding that the mother's testimony were not entirely credible. Because substantial evidence supports the ALJ's credibility determination, remand is not required on this issue.

## G.      Compassionate Allowance Claim

Plaintiff next contends that the ALJ committed plain legal error by stating that compassionate allowance cases are identified only at the initial determination level. (Pl. Br. at 18.) She argues that "the ALJ's failure to code and treat [her] case as a CAL case" warrants "reversal of the decision for the payment of benefits." (*Id.* at 20.)

The Social Security Administration (SSA) has implemented an expedited process to evaluate "critical cases." *See* the Hearing Appeals and Litigation Law Manual (HALLEX) § I-2-1-40.[12]

_____

[12] HALLEX can be accessed at http://www.ssa.gov/OP_Home/hallex/I-02/I-2-1-40.html (last visited August 21, 2013).

There are five categories of critical cases, including a compassionate allowance (CAL) case.[13]  *See id.*  On February 26, 2010, the SSA added MSUD to the list of medical conditions that qualify as a CAL case.[14]  *See* Program Operations Manual System (POMS) DI 23022.445.  CAL cases may be "identified at the initial level through an automated process" or at later stages of review, "including at the Court level."  HALLEX § I-2-1-40(E).  The purpose of this expedited process is to "allow the [SSA] to target quickly the *most obviously disabled individuals* for allowances based on *objective medical information* that [the SSA] can obtain quickly."  *Id.*  (emphasis added).  Notably, identifying a case as a CAL case does not mean the claimant is *per se* disabled.  *See* POMS DI 23022.445 ("Adjudicators may, at their discretion, use the Medical Evidence of Record or the Listings suggested to evaluate the claim .... the decision to allow or deny the claim *rests with the adjudicator.*") (emphasis added).

Here, the ALJ noted counsel's request that Plaintiff's case be identified as a CAL case.  (R. at 18.)  He stated that "CAL cases are identified at the initial level through an automated process" and must "meet the strict criteria."  (*Id.*)  Finding that Plaintiff's case was not identified as a CAL case at the initial administrative level, the ALJ "continue[d] [his] decision-making in the usual manner."  (*Id.*)  The ALJ failed to note that CAL cases can be identified at later stages in the review process.  *See* HALLEX § I-2-1-40(E).  By adjudicating Plaintiff's claim "in the usual manner," without identifying it as a CAL case, the ALJ violated HALLEX and the POMS.  Nevertheless,

---

[13]  The other four situations are: (1) the claimant's illness is terminal; (2) the claim involves a military service casualty case (and the injury occurred on or after October 1, 2001); (3) the claimant is without, and is unable to obtain food, medicine or shelter (i.e., in dire need); and (4) there is an indication that the claimant is suicidal or homicidal. (HALLEX) § I-2-1-40(B).

[14]  The complete list is available at http://www.ssa.gov/compassionateallowances/conditions.htm (last visited August 21, 2013).

because "HALLEX does not carry the authority of law," the ALJ's error warrants remand only if Plaintiff's claim was prejudiced by the error. *See Newton*, 209 F.3d at 459; *Bornette*, 466 F. Supp. 2d at 816 (the violation of a ruling is procedural error warranting reversal "only when [the] complainant affirmatively demonstrates ensuant *prejudice*) (emphasis in *Bornette*) (citations omitted).

In the Fifth Circuit, "[p]rocedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)). To establish prejudice, Plaintiff must show that the ALJ's identification of her case as a CAL case might have led to a different decision of disability. *See Newton*, 209 F.3d at 458; *McNair*, 537 F. Supp. 2d at 837.

Plaintiff does not argue and cites no legal authority to support a finding that she was prejudiced by the ALJ's failure to identify her case as a CAL case. As noted, regardless of whether the ALJ identified Plaintiff's case as a CAL case, the ALJ had the discretion to approve or deny her claim based on the medical evidence of record and the suggested listings. *See* POMS DI 23022.445. The ALJ made a credibility determination, considered and weighed all of the evidence of record, and found that Plaintiff was not disabled because her MSUD did not meet, medically equal, or functionally equal a listed impairment. Because the ALJ would have reached the same disability determination if he had identified Plaintiff's case as a CAL case, his error does not warrant reversal. *See Thoreson v. Astrue*, No. CIV. 11-2910 JNE/SER, 2013 WL 869375, at *20 (D. Minn. Jan. 29, 2013), *rec. adopted sub nom. Thoreson v. Colvin*, 2013 WL 848720 (D. Minn. Mar. 7, 2013) (finding no reversible error where the Appeals Council "declin[ed] to find that [the claimant] met

a listed impairment" based solely on her eligibility for CAL; pointing to the POMS's provision that the decision to allow or deny a claim rests with the adjudicator, and noting the claimant's failure to argue and prove she met the listings at issue).  Accordingly, remand is not required on this issue.

## III.    RECOMMENDATION

*Plaintiff's Motion for Summary Judgment* should be **DENIED**, *Defendant's Motion for Summary Judgment* should be **GRANTED**, and the final decision of the Commissioner should be **AFFIRMED**.

**SO RECOMMENDED** on this 27th day of August, 2013.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE